FILED

2024 Sep-17  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | | |
|---|---|---|
| DANNY SMITH, ET AL., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | CIVIL ACTION NUMBER: |
| COLBERT ANIMAL SERVICES AND | ) | 3:24-CV-01252-CLS |
| COLBERT COUNTY. | ) | |
| | ) | |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Comes now the plaintiff, Danny Smith, initiating this legal action seeking monetary damages on his behalf. This action is brought primarily to safeguard rights guaranteed under 42 U.S.C. §1983, which offers redress for violating rights, privileges, or immunities protected by the United States Constitution.

## I.   JURISDICTION AND VENUE

1.    The authority of this Court is invoked for Counts I-II pursuant to 28 U.S.C. § 1331, because each is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and each alleges violations of the United States Constitution. The supplemental authority of this Court is invoked under 28 U.S.C. § 1367(a) for Counts III-V asserting pendent state-law claims.

2.    Venue is proper in this division and district under 12 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the

claims occurred in this division and district. Venue is proper in this division and district under 28 U.S.C. § 1391(b)(1) and (c)(2) because the defendants reside in this district and division.

## II.    **PARTIES**

3.    The plaintiff, Danny Smith, is a resident and citizen of Colbert County, Alabama, over the age of nineteen (19).

4.    Defendant Colbert Animal Services is a nonprofit entity located and operating within this district in Colbert County, Alabama.

5.    Defendant Colbert County is located within this district.

## III.    **STATEMENT OF FACTS**

6.    Sometime prior to 2022, Colbert County either contractually or by vote of its commissioners, engaged the services of the private entity, Colbert County Animal Control Association ("CACA").

7.    CACA was organized to operate exclusively for the purposes "which shall qualify it for exemption under Section 501(c)(3) of the Internal Revenue Code."

8.    The exempt purposes set forth in Section 501(c)(3) do not include animal control.

9.    On or around October 18, 2019, by majority vote CACA's Board of Directors changed its name to Colbert Animal Services ("CAS"), and later filed the

name change with the Secretary of State on or around January 14, 2022.

10.     As such, CAS is a nonprofit who's stated purpose is to (a) contract with the municipalities in Colbert County and Colbert County for the control of animals in Colbert County and the municipalities thereof, (b) own or lease an animal pound, operate or cause such pound to be operated, and (c) do all things necessary to carry out the foregoing.

11.     The name change occurred as part of an alleged joint venture between Colbert County, Tuscumbia, Muscle Shoals and Sheffield. *See*, *e.g.*, Facebook Post,



## COLBERT COUNTY'S AGENT MADE THE DECISION TO HIRE SPEEGLE AS CAS'S DIRECTOR

12.     CAS is owned and operated exclusively by its Board of Directors ("Board") with its day-to-day management delegated to a director of animal shelter that the Board supervises; CAS and its employees are not under the general supervision of the County Sheriff or any municipality's police chief.

13.    Persons other than those identified in the articles of incorporation may sit on the Board by vote of the Board.

14.    At all relevant times, CAS's Board consisted of at least the following:

   a.  One sitting Colbert County Commissioner,

   b.  The sitting Mayor of Tuscumbia,

   c.  The sitting Mayor of Sheffield,

   d.  The sitting Mayor of Muscle Shoals, and,

   e.  One Citizen-at-Large.

15.    Colbert County Commissioner Tori Bailey ("Bailey") is Colbert County's agent.

16.    In that capacity, Bailey served as Chair of CAS's Board.

17.    Charles Corey Speegle ("Speegle") operated and operates a K-9 search and rescue service. For an undisclosed reason, in its 2020-2021 budget, Colbert County apportioned $51,000 annually to pay Speegle for those services. That money was not part of Colbert County's funding of the Sheriff's budget; the Sheriff had his own Search and Rescue Unit (SAR). Instead, the $51,000 was a separate line-item expenditure.

18.    According to LinkedIn, Speegle also did and does operate the business, "Second Amendment AK47 and SKS Parts."

19.    And Speagle volunteered as a Colbert County Reserve Deputy.

a. Under the law, reserve deputy sheriffs are volunteers that need not be APOSTC certified and are allowed to serve only in limited capacities while under the <u>direct</u> control and supervision of a lawful sheriff's department officer or certified law enforcement officer, or when supervised <u>indirectly</u> by a certified law enforcement officer while controlling traffic or crowds. *See* Ala. Code §§ 11-43-210 and 45-17-231.20 (2013).

20.     Bailey wanted Speegle hired for the position, Director of Animal Shelter, and as Chair she operated to ensure his hire by the Board.

21.     In early 2022, CAS hired the unqualified Speegle, instead of the more experienced and qualified Anthony Wilbanks, to fill the Director of Animal Shelter position.

## CAS FUNDS ITS OPERATION USING PRIVATE AND PUBLIC MONIES

22.     On or around December 29, 2022, CAS filed articles of incorporation for the non-profit, Colbert Animal Services Foundation; CAS is its sole member and Speegle is the sole director on its Board of Directors. *See* excerpt from Articles of Incorporation,

### Additional Details

**Directors**

| Director | Street Address | Mailing Address |
|---|---|---|
| Corey Speegle | 5010 Missouri Street<br>Tuscumbia, AL 35674 | 5010 Missouri Street<br>Tuscumbia, AL 35674 |

**Incorporators**

| Incorporator | Street Address | Mailing Address |
|---|---|---|
| Colbert Animal Services | 5010 Missouri Street<br>Tuscumbia, AL 35674 | 5010 Missouri Street<br>Tuscumbia, AL 35674 |

23.     The stated purpose of Colbert Animal Services Foundation ("CAS Foundation") is the solicitation, procurement, receipt, handling, management, maintenance, accounting, and allocation of charitable donations made for the care, handling, and control of animals in Colbert County, Alabama. "It is to qualify as an exempt corporation under Internal Revenue Code Section 501(c)(3)."

24.     CAS is the sole beneficiary of the charitable donations Colbert Animal Services Foundation receives.

25.     Neither CAS nor CAS Foundation is found as part of a Tax-Exempt Organization Search on the IRS's website, which is used to determine their eligibility to receive tax-deductible charitable contributions or their tax-exempt status.

26.     Upon dissolution of CAS its assets do not revert to any government entity, but instead they are to be donated to and for a purpose consistent with then-existing IRS laws.

## CAS IS COLBERT COUNTY'S AGENT, OPERATING AS ITS FUNCTIONAL EQUIVALENT

27.     Colbert County contractually or by vote of its commissioners, engaged the services of CAS.

28.     CAS claims it is an agent of Colbert County.

29.     Colbert County claims CAS is its agent.

30.     CAS claims its animal control officers are agents of Colbert County.

31.    Colbert County claims CAS Animal Control Officers are its agents.

32.    Rightly or wrongly, CAS has represented in filings with the State of Alabama that it is a quasi-governmental entity, and Colbert County assistant district attorneys have made similar representations concerning CAS in Colbert County Circuit Court.

33.    Shortly after hiring Speegle, Bailey and Colbert County Administrator Roger Creekmore ("Creekmore") approached Frank Williamson (former Colbert County Sheriff) ("Williamson") and told him that they wanted Speegle sworn in, but this time as a Colbert County Deputy Sheriff.

34.    Williamson declined because Speegle was not qualified for APOSTC certification. Still, because Bailey and Creekmore could affect his budget, he told them he could have Speegle sworn in again as a Colbert County Reserve Deputy. They agreed and Speegle was re-sworn.

35.    Bailey and Creekmore returned and told Williamson that they wanted him to provide Speegle with a Colbert County Sheriff's vehicle for his use while working for CAS. Williamson felt obliged and provided CAS/Speegle with a fully equipped patrol vehicle, including functional emergency lights.

36.    CAS or the sheriff removed from the vehicle the insignia of the Colbert County Sheriff and in its place a new insignia was fashioned that represented the vehicle was operated by a law enforcement agency.

a. CAS's other vehicles, operated by animal control officers, evidence similar insignia.

b. As of May 16, 2024, even CAS's Facebook page represented the nonprofit as a law enforcement agency. *See* Print Screen Excerpt,



c. In December 2022, several insignias on CAS's vehicles looked as follows:







    d. The vehicles do not exhibit any indication that they are not operated by law enforcement, nor that they are operated by a nonprofit entity.

37.    Bailey and Creekmore returned, and this time they told Williamson that because of a lack of cell coverage in rural areas, they wanted Williamson to allow CAS to use the Colbert County Sheriff's radio frequency, which includes but is not limited to, the use of dispatch by Colbert County 9-1-1. Again, Williamson felt obliged, and he granted the request.

38.    CAS and Colbert County wrongly treated each of those animal control

officers as if they were law enforcement officers.

39. CAS's Board and Colbert County's Administrator arranged for, directed, and allowed animal control officers to operate vehicles owned by Colbert County and use other equipment owned by Colbert County.

40. With the consent of its Board and government partners, Speegle and the other animal control officers started wearing a uniform that gave the appearance that they were law enforcement; they operated vehicles designated as law enforcement; carried a badge; openly carried a holstered handgun and or taser, and handcuffs; and at times, donned a tactical vest or bullet proof vest with his badge affixed.

## POLICIES, PRACTICES, OR CUSTOMS OF CAS AND COLBERT COUNTY

41. At all times relevant Colbert County and CAS knew or should have known a) any police powers of Colbert County and the police powers of municipalities were non-delegable b) CAS's employees did not possess statutorily granted police powers, and c) the Director of Animal Shelter and CAS's other animal control officers were not legally authorized to seize animals not-at-large, especially livestock.

42. Colbert County has and had an official policy, practice, or custom enacted or acquiesced to, or ratified, by its commission and county administrator, which outsourced to CAS the operation of a pound, the employment of animal

control officers charged with enforcement of laws, and the provision of animal protective services, including the seizure of animals owned and on the property of the owners.

43.     As part of that policy, practice or custom, Colbert County engaged in the following:

  a.     The county placed Tori Bailey on CAS's Board where she serves as Chair.

  b.     The county paid CAS for operating a pound, impoundment and care of animals, and animal-related law enforcement and control.

  c.     The county authorized, directed, and allowed CAS's search and seizure of animals without probable cause or due process, and the subsequent disposition of those animals without due process.

44.     CAS has a policy, custom, or practice of allowing its animal control officers to enter and search private properties without consent or a warrant.

45.     CAS has a policy, custom, or practice of seizing dogs, cats, and other animals, including livestock, found on their owners' properties, based on the subjective belief of untrained animal control officers that the animal is sick or disabled due to neglect or cruel treatment.

46.     CAS has a policy, custom, or practice of disposing of seized animals, without notice to their owners, when the owners do not pay the fees charged by CAS for boarding and care.

## COLBERT COUNTY AND CAS CLAIM A RIGHT TO CONFISCATE ANIMALS UNDER THE CODE OF ALABAMA

47.     In the past and on an ongoing basis, pursuant to Ala. Code § 3-1-13 and or § 3-1-16 and or §§ 13A-11-243 through 13A-11-245, Colbert County claims independently, and or through its use of CAS, a right to (a) confiscate dogs, cats, and other animals who appear sick or disabled due to neglect or cruel treatment, (b) a right after confiscation to charge and collect from the owner, before the animal's return, fees for board and any medical care, and (c) a right to dispose of an animal if its owner fails to pay the fees charged for board and care.

48.     As a matter of policy, practice, or custom, Colbert County directed and or authorized CAS to operate pursuant to the provisions of § 3-1-13 and or § 3-1-16 and or §§ 13A-11-243 through 13A-11-245.

49.     In the past and on an ongoing basis, independently and or as the agent of Colbert County and or certain municipalities, CAS claims a right pursuant to Ala. Code § 3-1-13 and or § 3-1-16, and or §§ 13A-11-243 through 13A-11-245, to (a) confiscate dogs, cats, and other animals who appear sick or disabled due to neglect or cruel treatment, (b) a right after confiscation to charge and collect from the owner, before the animal's return, fees for board and any medical care, and (c) a right to dispose of an animal if its owner fails to pay the fees charged for board and care.

## COLBERT ANIMAL SERVICES ILLEGALLY ENTERED SMITH'S PROPERTY AND WRONGLY SEIZED HIS HORSE

50.     At all relevant times, Plaintiff Danny Smith ("Smith") lived in uncorporated Colbert County.

51.     Smith's residence and adjoining property was and is secured, including pastures, a residence, barn, etc.

52.     Smith owns livestock that he cares for and grazes on his property, including multiple horses.

53.     While at Smith's home, his girlfriend, Angela Qualls ("Qualls"), observed the neighbor's dog(s) on Smith's property harassing the horses.

54.     Qualls had no ownership interest in Smith's property, Smith's property was not her residence, she had no ownership or possessory interest in the horses on Smith's property, and she was not the custodian of Smith's horses.

55.     On or around January 20, 2023, while at Smith's residence again, Qualls observed what she believed was blood on the back leg of one of the horses; she thought the horse had been injured by the neighbor's dogs' earlier harassment.

56.     Qualls called a friend's cell phone who happened to volunteer with CAS, and she vented to her friend about the neighbor's dogs and the fact that she believed they had injured Smith's miniature horse, Spanky. That friend then talked to someone with CAS because afterward its animal control officer, Jessica Hogan ("Hogan"), showed up unannounced at Smith's property.

13

57.     In Smith's absence, Hogan entered the property and then entered a secured pasture where she observed what she believed was a dog inflicted wound on the horse's penis.

58.     Hogan could tell the horse was well fed and otherwise healthy, except for the wound, and the circumstances were not exigent. Therefore, she asked Qualls if she would administer the horse anti-biotics if CAS provided them to her.

59.     Qualls declined explaining to Hogan that she did not live on the property, Smith owned the horse, and that he takes care of the horses.

60.     Hogan left and within forty-five minutes Speegle contacted Qualls demanding to see the horse. Qualls told Speegle that the horse belonged to Smith, and she initiated a conference call between her, Speegle, and Smith.

61.     Speegle told Smith he wanted to come see the horse and Smith told him there was no need because he was caring for the animal.

62.     Speegle became agitated and barked back, "No, I'm coming out there and something is going to be done for that horse today." Without having seen the animal, Speegle continued and told Smith that the "horse is in distress and may even have to be put down."

63.     Smith advised Speegle the horse is not in distress; it is eating, drinking, urinating, and walking unencumbered; and that he was monitoring and "doctoring" the animal. Smith told Speegle he would seek the intervention of a veterinarian if it

became necessary.

64.     Speegle then threatened Smith. Speegle told Smith that if he did not get the horse veterinary care immediately that he was going to charge him with felony animal neglect and that the charge carried a fifteen (15) year sentence.

65.     In response, Smith said fuck you, and hung up the phone.

66.     Afterwards, Speegle and Hogan arrived at Smith's property and Qualls met them at the door of Smith's residence.

67.     Speegle also appeared as law enforcement, wearing a holstered gun in plain view with handcuffs on his belt.

68.     Without Smith's permission, Speegle and Hogan entered Smith's home, walked through it to the back door, and then proceeded to Smith's barn where Smith had moved the horse to care for him.

69.     At a distance, Smith saw the three headed to his barn and he followed.

70.     Speegle entered the barn before Smith caught up. Smith arrived and Speegle gave him an ultimatum; get the horse veterinary care now or surrender it to CAS.

71.     Smith advised that the horse is not in distress, he was caring for the horse, he was not calling a veterinarian at this time, and he refused its surrender.

72.     Speegle phoned a veterinarian, Dr. Gray, and put her on the phone with Smith. She advised Smith to get veterinary care now or surrender the animal.

73.     Smith refused to surrender the horse, and Speegle and Hogan started coercing Qualls to surrender the animal. Again, Qualls had no ownership or possessory interest in the horse or the property, she was not its caretaker, and both facts were known to Hogan and Speegle.

74.     Smith told Speegle and Hogan to leave Qualls alone and that it was not Quall's horse to surrender.

75.     Still, they continued threatening and harassing Qualls; she started crying and finally relented out of fear, then signed the surrender paperwork over Smith's objection.

76.     Speegle and Hogan left with Smith's horse in a trailer after almost injuring it during the loading process.

77.     Before and after this instance with Smith, CAS routinely entered on people's property without a warrant and confiscated animals that are not dogs or cats from their owners.

78.     Unable to secure the return of his horse from CAS, Smith reported its theft to Creekmore, but he did nothing. Then, on or around January 27, 2024, Smith reported the theft to the Colbert County Sheriff.

79.     Smith gave a formal statement to Deputy Sheriff Jonathan R. Harkins ("Harkins"), who made it part of an Alabama Uniform Incident/Offense Report.

80.     Neither Harkins, Ballentine nor his deputies took any action against

CAS, Speegle, or Hogan in response to the formal report of theft by Smith.

81.    Ballentine continues to allow Speegle to serve as a reserve deputy sheriff, and CAS use his Agency O.R.I.

82.    Ballentine continues to allow CAS to use his office's equipment.

83.    Speegle had a veterinarian examine Smith's horse, and it was determined the horse had a wound on a non-emergent tumor or growth on his penis; the horse had not suffered a dog attack and there was no evidence the horse was sick or disabled due to neglect or animal cruelty.

84.    The medical condition was not exigent as at least three days passed before the veterinarian removed the growth and sent it for biopsy.

85.    CAS kept the horse for nearly 3 months before holding a meeting with Smith on April 21, 2023.

86.    Present at the meeting, acting on Colbert County and CAS's behalf, was Bailey, Speegle, and Hogan. Sheriff Ballentine was also present.

87.    During the meeting Speegle advised Bailey that the horse was "signed over" to animal services.

88.    In rebuttal, Smith stated (a) he owned the horse and did not sign it over to animal services, (b) he had not provided Speegle or Hogan permission to enter upon his property, his home, his barn, or otherwise, (c) the horse was not in distress, and (d) he was caring for the horse.

89.     No one present argued Smith had neglected or cruelly treated the horse. No one even represented that the veterinary care the horse received was necessary. Instead, Tory Baily simply told Smith if he paid the $2,000+ in fees and signed a general release, CAS would return the horse.

90.     Smith refused to sign any release and pay any fees.

91.     Excerpts from the general release CAS presented during the meeting reflect the following:

WHEREAS, the undersigned Danny Smith is, or in the past has been, the owner of one miniature horse known as "Spanky",

\*\*\*

WHEREAS, Colbert Animal Services does, for itself, its agents and employees, represent that said animal came into its custody lawfully and that any actions taken by it were intended solely for the benefit and comfort of the animal and not the result of any intent, design or purpose of Colbert Animal Services or its agents or its employees to deprive the owner of the use and benefit of said animal, and

\*\*\*

THEREFORE, Know All Men By These Presents, that I, Danny Smith, for and in consideration of the delivery of custody and ownership of "Spanky" to me the receipt of which is hereby acknowledged, do, for myself and my heirs, executors, administrators, successors and assigns, hereby release, acquit, and forever discharge Colbert Animal Services and its agents, servants, employees, successors and assigns, from any and all actions, causes of actions, claims, demands, damages, loss of services, expense and compensation, which I now may have or may hereafter have on account of, or arising out of any matter or thing which has happened,

developed or occurred before the signing of this Release and particularly in regard to those certain alleged circumstance and occurrences in conjunction with the transfer of custody and ownership of "Spanky" and any medical treatment and boarding of said animal.

I further understand and agree that this settlement is the compromise of doubtful and disputed claims and that these presents are not to be construed as an admission of liability on the part of the party or parties hereby released by whom liability is expressly denied.

92.    CAS never returned the horse, denying Smith of its use, enjoyment and benefit.

## IV.    CAUSES OF ACTION

### A.    COUNT I: VIOLATIONS OF U.S. CONST., AMEND. IV, THROUGH 42 U.S.C. §1983 (UNLAWFUL SEARCH AND SEIZURE) (AGAINST CAS)

93.    Plaintiff Smith brings this cause of action, Count I, against Defendant CAS through 42 U.S.C. §§ 1983 and 1988, seeking money damages for violations of his Fourth Amendment right to be free from unreasonable searches and seizures.

94.    Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-4, 6-17, 21, 27-49, 50-90, and 92, *supra*.

95.    A private entity is subject to liability under § 1983 when it performs a function traditionally within the prerogative of the state or its delegates, thereby becoming its functional equivalent.

96.    Searches and seizures are functions exclusive to the state and its delegates, not afforded private citizens. When private citizens engage in searches or seizures on or of another's property, without consent, they are subject to criminal

19

prosecution.

97.    CAS was acting under color of law as the functional equivalent of Colbert County when pursuant to the customs or usage of Colbert County, and or under authority granted them by Colbert County as agents of Colbert County, CAS and its employees engaged in searches on Smith's property, and a seizure of Smith's property

98.    While entering and searching Smith's property, seizing Smith's horse, and interacting with Smith, CAS was operating under color of law as the county's functional equivalent, satisfying the county's obligation under Ala. Code § 3-7A-7 (1975), and providing animal protective and law enforcement services on its behalf that may otherwise be provided under Ala. Code § 3-1-16 and Ala. Code § 13A-11-243.

99.    While entering and searching Smith's property, seizing Smith's horse, and interacting with Smith, CAS was also acting under the color of law as provided under Ala. Code § 3-1-13 (1975).

100.   While engaging Smith, searching his property and seizing his horse, both Speegle and Hogan were acting in their capacities with CAS and not as private citizens.

101.   While engaging Smith, searching his property and seizing his horse, both Speegle and Hogan acted pursuant to CAS's official policies, practices, or

customs.

102.   CAS's official policies, practices, or customs caused Hogan to illegally enter Smith's secured properties without his consent or a warrant, and without evidence of the seized horse's injury in plain view or evidence of exigent circumstances.

103.   CAS's official policies, practices, or customs caused Speegle to illegally enter upon Smith's secured properties without his consent or a warrant, and without the seized horse's injury in plain or evidence of exigent circumstances.

104.   CAS's official policies, practices, or customs caused Speegle and or Hogan to unreasonably seize Smith's horse without his consent or a warrant, and without evidence of exigent circumstances, neglect, or cruelty.

105.   CAS has violated Smith's Fourth Amendment rights under the U.S. Constitution.

106.   The violation of Smith's Fourth Amendment rights caused him to suffer injuries, including monetary loss and damages associated with emotional pain and suffering.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against CAS; (2) award Plaintiff compensatory damages for mental anguish, and to vindicate the violation of her valuable intangible constitutional rights; (4) award Plaintiff punitive damages, (5) award Plaintiff attorney's fees, expert witness fees,

court costs, and interest as allowed by law; and (6) award Plaintiff all other relief declared proper by the Court.

**B.    COUNT II: VIOLATIONS OF U.S. CONST., AMEND. IV, THROUGH 42 U.S.C. §1983 (UNLAWFUL SEARCH AND SEIZURE) (AGAINST COLBERT COUNTY)**

107.    Plaintiff Smith brings this cause of action, Count II, against Defendant Colbert County through 42 U.S.C. §§ 1983 and 1988, seeking money damages for violations of his Fourth Amendment right to be free from unreasonable searches and seizures.

108.    Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-4, 6-17, 21, 27-49, 50-90, and 92, *supra*.

109.    Counties and municipalities are liable under § 1983 when their policies, practices, or customs cause violations of the constitution.

110.    At all times relevant CAS and its animal control officers were agents of Colbert County, acting as its functional equivalent under color of law.

111.    While on Smith's property, and just before entering, CAS was acting pursuant to Colbert County's official policies, practices or customs.

112.    Colbert County's official policies, practices, or customs concerning CAS caused it to illegally enter Smith's secured properties without his consent or a warrant and engage in the preceding without first having evidence of the seized horse's injury in plain view or exigent circumstances.

113.   Colbert County's official policies, practices, or customs caused CAS to illegally and unreasonably seize Smith's horse without Smith's consent or a warrant.

114.   Colbert County has violated Smith's Fourth Amendment constitutional right to be free from unreasonable searches and seizures.

115.   The violation of Smith's Fourth Amendment rights caused him to suffer injuries, including monetary loss and damages associated with emotional pain and suffering.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Colbert County; (2) award Plaintiff compensatory damages for mental anguish, and to vindicate the violation of her valuable intangible constitutional rights; (4) award Plaintiff attorney's fees, expert witness fees, court costs, and interest as allowed by law; and (5) award Plaintiff all other relief declared proper by the Court.

## C.    COUNT III: NEGLIGENCE (AGAINST CAS)

116.   Plaintiff brings this cause of action, Count III, against CAS based on its negligence and or the negligence of its employees or agents.

117.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-4, 12-27, 33-41, 44-47, 49, 50-92, *supra*.

118.   Speegle and Hogan were acting within the scope of their employment

with CAS and furthering the interests of CAS when they entered upon Smith's property, his home and his barn; confiscated his horse; converted Smith's horse, and then disposed of that horse.

119.  CAS had a duty to operate reasonably and or skillfully.

120.  Furthermore, a common law duty of care arises when the harm at issue is of a type reasonably foreseeable under the circumstances, and the imposition of such duty and liability comports with public policy under those circumstances.

121.  Given the law, its policies, customs, and practices, and the written duties of its animal control officers—CAS could or should have reasonably foreseen that Speegle, Hogan, and or its animal control officers would (a) misinterpret or misapply its policies or the relevant law, (b) unlawfully confiscate animals other than dogs or cats; and (c) demand reimbursement for board and veterinary care before returning the confiscated animals and dispose of those animals without consent if not reimbursed.

122.  Under the circumstances, CAS could or should have reasonably foreseen Speegle, Hogan, and or its animal control officers would violate owners' constitutional rights and engage in torts such as trespass and conversion in furtherance of CAS's interests.

123.  CAS had a common law duty to prevent the actions of its employees made subject of this suit, as well as a duty under its agreement or contract with

24

Colbert County to operate skillfully and ensure it and its employees acted reasonably and pursuant to the law.

124.   CAS failed to act reasonably/skillfully, and it further breached its duty of care by wrongly interpreting and applying the applicable provisions of the Code of Alabama to Smith and his horse.

125.   CAS failed to act reasonably/skillfully, and it further breached its duty of care by failing to perform adequate due diligence and make adequate inquiries as to the legality of its and its employees' activities.

126.   CAS failed to act reasonably/skillfully, and further breached its duty of care by (a) failing to adequately train its employees, including Speegle and Hogan, (b) failing to adequately supervise its employees, including Speegle and Hogan, and  (c) failing to take remedial action after animal control officers had already wrongly confiscated animals in a similar manner, and or it was known to CAS its animal control officers lacked police powers.

127.   Through its policies, practices, and customs, as well as the endorsement of Speegle and Hogans actions by its Board, CAS participated in, authorized, or ratified the wrongful acts of Speegle and Hogan.

128.   CAS's unskillful negligent operation, and the illegal acts of its employees, proximately caused Smith's injuries, including monetary loss and damages associated with emotional pain and suffering.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendant CAS; (2) award Plaintiff compensatory damages; (3) award Plaintiff punitive damages; and (4) award Plaintiff all other relief declared proper by the Court.

### D.   COUNT IV: NEGLIGENCE (AGAINST COLBERT COUNTY)

129.   In addition, or in the alternative, Plaintiff brings this cause of action, Count IV, against Defendant Colbert County based on negligence.

130.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-3, and 5-92, *supra*.

131.   Colbert County's commissioners, its administrator, county attorney and CAS are agents, officers, or employees of the county.

132.   Colbert County is liable for the acts of its agents, officers, or employees.

133.   Legislative law does not impose on any county a duty to provide services protecting dogs, cats, or other animals from neglect or abuse.

134.   Once a county organizes and voluntarily provides said animal protective services, a special duty arises and is imposed to provide those services in a skillful manner.

135.   Colbert County organized and provided animal protective services through its use of CAS and the authority it granted CAS, including the confiscation

of dogs, cats, and other animals.

136.   A special duty was imposed on Colbert County to act skillfully in the provision of those animal protective services, including a duty to ensure that CAS would and did act skillfully on its behalf.

137.   Colbert County breached its duty of care due to the neglect, carelessness, or unskillfulness of Colbert County's commissioners, administrator, and county attorney when (a) engaging CAS, (b) limiting and defining appropriate and legal activities for CAS, and (c) supervising CAS's activities to ensure its skillful operation.

138.   Colbert County breached its duty of care due to the neglect, carelessness, or unskillfulness of its agent, CAS.

139.   Smith has suffered injuries, including monetary loss and damages associated with emotional pain, suffering, and embarrassment.

140.   Smith's injuries were proximately caused by the neglect, carelessness, or unskillfulness of Colbert County's officers, employees, and agents, including, CAS.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendant Colbert County; (2) award Plaintiff compensatory damages; (3) award Plaintiff all other relief declared proper by the Court.

### E.    COUNT V: CONVERSION (AGAINST CAS)

141.   In addition, or in the alternative, Plaintiff brings this cause of action, Count V, against Defendant CAS based on conversion.

142.   Plaintiff incorporates by reference, as if fully stated here, the factual allegations in Paragraphs 1-4 and 50-92, supra.

143.   CAS was on notice that Smith had both an ownership and possessory interest in the horse made subject of this suit.

144.   CAS was on notice that Qualls was not the owner or custodian of the horse made subject of this suit.

145.   Speegle and Hogan were acting within the scope of their employment with CAS and furthering the interests of CAS when they unlawfully entered upon Smith's property and entered his home and his barn; unlawfully confiscated Smith's horse; unlawfully detained Smith's horse; and unlawfully disposed of that horse without consent after Smith refused to pay the fees CAS tried to extort from him.

146.   Through its policies, employees, and Board, CAS participated in, authorized, or ratified the wrongful acts of Speegle and Hogan above.

147.   CAS wrongfully took Smith's horse without his consent.

148.   CAS wrongfully detained Smith's horse without his consent.

149.   CAS wrongfully refused to return Smith's horse.

150.   CAS wrongfully assumed ownership of Smith's horse without his

consent and disposed of Smith's property.

151.    CAS has denied Smith the use, enjoyment, and benefit of his horse.

152.    CAS's conversion of Smith's property has caused him to suffer injuries, including monetary loss and damages associated with emotional pain, suffering, and embarrassment.

**WHEREFORE**, Plaintiff respectfully prays this Court: (1) enter a judgment against Defendant Colbert County; (2) equitable relief ordering the return of the horse; (3) award Plaintiff compensatory damages; (4) award Plaintiff all other relief declared proper by the Court.

Respectfully submitted,

/s/ Robert J. Camp
Robert J. Camp
Counsel for the Plaintiff

OF COUNSEL:
**WIGGINS, CHILDS, PANTAZIS, FISHER & GOLDFARB, L.L.C.**
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
205-314-0500

## **CERTIFICATE OF SERVICE**

I certify that on this the 17th day of September 2024, I filed the above pleading with the court using the CM/ECF system, which will send a copy to the following:

Colbert Animal Services
C/O Corey Speegle, Director
5010 Missouri Street
Tuscumbia, Alabama 35674

Colbert County
C/O County Administrator Roger Creekmore
201 N Main Street
Tuscumbia, Alabama 35674

/s/ Robert J. Camp
**ROBERT J. CAMP**